ATTORNEY GENERAL v PUBLIC SERVICE COMMISSION

Docket No. 59051. Submitted June 4, 1982, at Lansing.—Decided July
    20, 1982. Leave to appeal applied for.

The Attorney General brought actions against the Public Service
    Commission to set aside the orders of the PSC approving
    contracts for the intrastate sale of natural gas by Michigan
    Consolidated Gas Company to Consumers Power Company.
    Michigan Consolidated and Consumers Power intervened. The
    Ingham Circuit Court, Ray C. Hotchkiss, J., consolidated the
    cases and dismissed the complaints, concluding that the Attor-
    ney General had not met his burden of proof of showing the
    contract rates to be clearly unreasonable and unlawful. The
    Attorney General appealed. *Held:*

    The PSC's determination should only be overturned if clearly
    unreasonable and unlawful. The Attorney General did not show
    this to be the case.

    Affirmed.

1. MINES AND MINERALS — PUBLIC SERVICE COMMISSION — INTRA-
    STATE SALES — JURISDICTION.

    The Public Service Commission has jursidiction to regulate the
    intrastate sale of natural gas under special contracts (MCL
    462.11; MSA 22.30).

2. PUBLIC UTILITIES — RATES — PUBLIC SERVICE COMMISSION —
    APPEAL.

    What return a public utility shall be entitled to earn upon its
    invested capital, and what items shall be considered as properly
    going to make up the sum total of that invested capital, are
    questions of fact for the determination of the Public Service
    Commission, and their conclusions thereon, upon which the
    rate is based, are unassailable unless, as a necessary result, it
    can be affirmatively asserted that the resultant rate is unrea-
    sonable and unlawful.

REFERENCES FOR POINTS IN HEADNOTES
[1] 64 Am Jur 2d, Public Utilities § 232.
[2] 64 Am Jur 2d, Public Utilities § 240.

*Frank J. Kelley,* Attorney General, *Louis J. Caruso,* Solicitor General, and *Hugh B. Anderson* and *Roderick S. Coy,* Assistants Attorney General, for the Attorney General.

*Frank J. Kelley,* Attorney General, *Louis J. Caruso,* Solicitor General, and *Arthur E. D'Hondt* and *S. David Kutinsky,* Assistants Attorney General, for the Public Service Commission.

*Gary L. Cowan, David P. Van Note* and *Dennis R. O'Connell,* for intervening defendant Michigan Consolidated Gas Company.

*Loomis, Ewert, Ederer, Parsley, Davis & Gotting* (by *George W. Loomis, Harvey J. Messing, Michael G. Oliva,* and *James A. Ault),* and *Lawrence B. Lindemer, Allen B. Bass* and *David A. Mixelonis,* for intervening defendant Consumers Power Company.

Before: DANHOF, C.J., and BEASLEY and J. P. SWALLOW,* JJ.

PER CURIAM. Appellant, the Attorney General, appeals from the July 8, 1981, order of the Ingham County Circuit Court affirming orders of the Public Service Commission of August 26, 1974, April 24, 1975, and January 3, 1977, each of which approved "special contracts" by which Michigan Consolidated Gas Company sold certain quantities of natural gas to Consumers Power Company. The commission assigned Case No. U-4498 to the first application for approval of contract, and that case was left open so that the two later contracts were brought to the commission's attention by motion.

The contracts were executed during a time of an

---

* Circuit judge, sitting on the Court of Appeals by assignment.

acute shortage of natural gas and during a time of accelerating gas prices arising from the world energy crisis. In a prior case, the commission had approved the purchased gas adjustment (hereinafter PGA) by which an energy utility such as Consumers Power Company could automatically increase its retail gas rate to reflect increased prices of purchased gas.

The price offered by Michigan Consolidated under the first of these three contracts (dated October 16, 1973) and finally accepted by Consumers Power Company, was $.87 per thousand cubic feet. That price was approximately the price Michigan Consolidated charged its retail customers. Hearings were held on January 25, 1974, March 27, 1974, and on April 8-16, 1974.

The Attorney General participated in these hearings and presented expert testimony. He contended that Michigan Consolidated should have sold the gas to Consumers Power at its wholesale cost of about $.5462 per Mcf to avoid a "windfall profit" to Michigan Consolidated. The hearing referee and, later, the commission, rejected the testimony and argument of the Attorney General. In its opinion and order of August 26, 1974, the commission approved the contract and the contract rate. It made the following findings, in part:

"On May 25, 1973, this commission approved a special contract in Case No. U-4333 which called for the sale by Consolidated to Consumers of 10 billion cubic feet of gas at a price of 87 cents per Mcf. * * *

"12. The commission finds that the contract price of 87 cents per Mcf is reasonable and should be approved. As a unanimous commission ruled in Case No. U-4333, the test of the reasonableness of a special contract price is whether it makes an appropriate contribution to the utility's cost of service and imposes no cost burden on its other customers. The evidence of record shows that

during 1973, the average rate paid by Consolidated's ratepayers for gas purchased under Consolidated's rate schedules was 88.3 cents per Mcf. Thus, the price of 87 cents per Mcf for gas delivered to Consumers in 1973 falls slightly short of making its full contribution to Consolidated's cost of service, but the cost burden on other customers, if any, is not substantial. With respect to the 6.8 billion cubic feet, it is clear that Consolidated's heating customer would have paid in excess of 87 cents per Mcf for the gas had weather been normal in Consolidated's service area. The commission also finds that the 87 cents per Mcf price is reasonable with respect to the 3.4 billion cubic feet purchased in December, 1973. Inasmuch as it appears its availability was occasioned by warmer than normal weather conditions, the finding as to its price is similar to the 6.8 billion cubic feet optioned in March, 1974. Even if the gas was 'surplus', however, the contract price is reasonable. While much ado has been made of the lack of Consumers' ability to bargain at arms length due to its adverse supply situation, it is apparent that the parties were influenced by this commission's unanimous decision in Case No. U-4333 which found 87 cents per Mcf a reasonable standard. Moreover, the record is clear that Consumers was in need of this additional supply, priority No. 2 being closed at the time of purchase and proceedings regarding curtailment of firm customers underway before the commission. Additionally, while the parties dispute the specific methodology of determining the cost of new gas, such as the December, 1973 3.4 billion cubic feet quantity may be characterized, the record shows that the price provided in the contract is less than the cost of new interstate gas to Consolidated when priced on an incremental basis. Similarly there is no dispute that the cost of other competitive energy such as residual fuel oil, distillates and propane, when calculated on a BTU equivalent basis, far exceeds the 87 cent price. Finally, a unanimous commission approved the sale by Consolidated to Michigan Gas Utilities Company of 2 billion cubic feet of gas at the 87 cent per Mcf price plus purchased gas adjustment on May 20, 1974 in Case No. U-4572 as reasonable.

"13. The sale of 10.2 billion cubic feet of gas to Consumers does not impair or adversely affect Consolidated's ability to meet its responsibility to serve its present customers or continue to furnish additional service requirements under Categories One through Four of its Controlled Service Program. The record does not reflect and the commission is not satisfied that the 10.2 billion cubic feet of gas subject to the special contract was sufficient for Consolidated to commence and sustain service under Category Five of its Controlled Service Program which is presently closed.

"14. The special contracts for the sale of 12.2 billion cubic feet of natural gas are in the best interests of the customers of Consumers. While this commission unanimously ruled in Case No. U-4333 that the primary consideration regarding price in a special contract is that the consideration received will contribute to the seller's overall cost of service, it is not unmindful of its obligation to review the transaction to determine whether or not the contract is detrimental to the customers of the purchasing company. The record clearly reflects that the additional 12.2 billion cubic feet of gas is beneficial to the customers of Consumers as it will permit the continuation of service to firm customers and all parties are in agreement. The record also reflects that the price for this supply is reasonable, particularly due to the continued interstate pipeline curtailments and the current cost of gas produced by Consumers at its Marysville gas reforming plant."

The contract prices of the second and third contracts were $.87 plus the applicable purchased gas adjustment. Appeals from all three orders were consolidated for hearing and, on July 8, 1981, the orders were affirmed.

This appeal presents the question of whether or not the rates approved by the commission in these three orders were unreasonably high. The commission is given broad discretionary power to set just and reasonable rates for privately owned public

utilities.[1] It is specifically vested with authority to regulate the rates of gas utilities.[2] The commission is given jurisdiction to regulate the intrastate sales of natural gas under special contracts.[3]

In *Michigan Bell Telephone Co v Public Service Comm,*[4] the Michigan Supreme Court quoted the following with approval from *Detroit v Michigan Railroad Comm.*[5]

"On matters involving the exercise of good common sense and judgment only, the determination of the commission must be held to be final unless such determination in its application results in the establishment by 'clear and convincing' proof of a rate so low as to be confiscatory or so high as to be oppressive. What return a public utility shall be entitled to earn upon its invested capital, and what items shall be considered as properly going to make up the sum total of that invested capital, are questions of fact for the determination of the commission, and their conclusions thereon, upon which the rate is based, are unassailable unless, as a necessary result, it can be affirmatively asserted that the resultant rate is unreasonable and unlawful.

"Between the point where a rate may be said to be so low as to be confiscatory and the point where it must be said to be so high as to be oppressive upon the public, there is a 'twilight zone' within which the judgment of the commission may operate without judicial interference. Assume that the commission, in determining the amount of the capital invested, allows as an element of the sum an amount which the court, if charged with the initial duty of determination, might find to be excessive or inadequate; or, assume that the commission of its best judgment, permitted a rate of return

---

[1] MCL 460.1 *et seq.;* MSA 22.13(1) *et seq.*

[2] MCL 486.253; MSA 22.1673, MCL 460.54; MSA 22.4, MCL 460.4; MSA 22.13(4), MCL 460.6a; MSA 22.13(6a), MCL 460.6b; MSA 22.13(6b).

[3] MCL 462.11; MSA 22.30.

[4] 332 Mich 7, 26-27; 50 NW2d 826 (1952).

[5] 209 Mich 395, 433-434; 177 NW 306 (1920).

upon the invested capital higher or lower than the court, under like circumstances, might believe to be proper—nevertheless, the court would not be warranted in interfering unless the rate, as established, was clearly unreasonable and unlawful."

The trial court, after review of the record before the commission, consideration of briefs, and the presentation of oral arguments, concluded that the Attorney General had not carried his burden to show that the three contract rates were clearly unreasonable and unlawful. After full consideration of the briefs on appeal and of the circuit court and commission records, we reach the same result and affirm. We have considered other issues raised and find them to be without merit.

Affirmed.